**In the Matter of the Complaint of ROB-BINS MARITIME, INC., as Owner of the M/T Alert, and Bay Towing Corporation, as Charterer and Owner pro hac vice of the M/T Alert, for Exoneration from or Limitation of Liability**

Civ. A. No. 2:94cv515.

United States District Court, E.D. Virginia, Norfolk Division.

June 9, 1995.

---

Rice Arthur Jett, Jr., McGuire, Woods, Battle & Boothe, Norfolk, VA, John David Padgett, McGuire, Woods, Battle & Boothe, Norfolk, VA, for plaintiffs.

Carter T. Gunn, Vandeventer, Black, Meredith & Martin, Norfolk, VA, Walter Bramblette Martin, Jr., Vandeventer, Black, Meredith & Martin, Norfolk, VA, Eugene J. O'Connor, Freehill, Hogan & Mahar, New York City, for Maersk, Inc., A.P. Moller.

Denham Arthur Kelsey, John Early Holloway, Hunton & Williams, Norfolk, VA, for Hale Intermodal Marine Co.

Phoenix Marketing Company, Portland, OR, pro se.

John Robert Crumpler, Jr., Kaufman & Canoles, Norfolk, VA, for General Motors Overseas Distribution Corp., General Motors Corp.

Melanie Fix, Guilford D. Ware, Crenshaw, Ware & Martin, Norfolk, VA, James W. Bartlett, III, Wilson, Elser, Moskowitz, Edelman & Dicker, Baltimore, MD, for Universal Maritime Service Corp.

## ORDER AFFIRMING MAGISTRATE JUDGE'S REPORT & RECOMMENDATION

DOUMAR, District Judge.

### I. Procedural Background

This matter is now before the court on Universal's objections to the recommendation of the Magistrate Judge that Hale Intermodal Marine Company ("Hale") be granted summary judgment in its claim against Universal Maritime Service Corporation ("Universal") for indemnity arising out of a fire on a barge on April 15, 1994. The fire caused extensive property damage. Universal is the stevedoring company which loaded the barge, the *Liberty Trader.* Hale is the owner of the barge. Hale claims that Universal breached its implied warranty of workmanlike service in loading the barge and seeks indemnity from Universal for any damages it will incur as a result of the fire.

Senior United States District Judge John A. MacKenzie, by an Order entered March 28, 1995, pursuant to 28 U.S.C. § 636(b)(1)(B), designated Magistrate Judge William T. Prince to conduct a hearing and to submit to a Judge of the court proposed recommendations for disposition of Hale's Motion for Summary Judgment Against Universal, filed February 17, 1995; and Universal's Cross–Motion for Summary Judgment filed March 6, 1995.

The Magistrate Judge held a hearing on March 30, 1995, and issued its Report and Recommendation on April 13, 1995, recommending summary judgment be granted in favor of Hale against Universal on Hale's claim for indemnity. Objections by Universal to said report were then lodged with the court and oral argument was requested. The undersigned District Judge held a hearing on the objections to the report and recommendation on May 30, 1995.

For the foregoing reasons, after *de novo* consideration of the objected-to portions of the report, the court will AFFIRM the recommendation contained in the Magistrate Judge's report and GRANTS Hale's motion for summary judgment against Universal.

### II. Facts

The record in this case contains a plethora of undisputed facts; the real dispute by Universal with the magistrate judge's report has to do with the legal implications of those

facts. The undisputed record shows the following. The barge *Liberty Trader* was chartered by Hale via an oral agreement to the Maersk company, and delivered on April 12, 1994, at Port Elizabeth, New Jersey. Maersk intended to use the barge to ship containerized cargo to Baltimore and Norfolk. Maersk had an oral agreement with Universal to perform stevedoring operations, including loading at the Dundalk terminal in Baltimore on April 14, 1994. Maersk, Hale, and Universal had a longstanding course of dealing with each other. There were no written contracts involved in the specific dispute at issue here.

Maersk normally determined a day in advance the number and type of containers it planned to load on a Hale barge. This information was provided to Hale's Port Superintendent, in this case Mr. Kellenberger, who would prepare a "prestow" plan. Kellenberger testified that the prestow plan would indicate to Universal "where I think the cargo should go on the barge so that its stays balanced and trimmed properly, keep the dangerous cargo separate." (Dep. at 42). Universal's Marine Manager, Mr. Benston, testified that the purpose of the prestow was to "give [Universal] a map, so to speak, of where to stow the individual containers on the basis of size, kind, and other distinguishing things." (Dep. at 23). Kellenberger's prestow plan had what Kellenberger admitted was a "stupid" mistake—it called for a 45 foot dry cargo container to be placed atop a 40 foot diesel generator container (used to power a refrigeration unit). The 45 foot container would overhang and block the 40 foot generator container's exhaust. The fire ultimately was caused by the build-up of heat resulting from this overhang.

The exhaust pipe configuration, which was designed by Hale, involves the exhaust pipe protruding horizontally out a foot or two at one end of the generator container, then bending 90 degrees up and terminating near the top edge of the generator container. Thus, something placed atop the generator container which overhangs the generator container by several feet will block the exhaust. It is this blocked emission which caused the excessive heat that built up, resulting in a fire starting in the cargo container above the exhaust pipe. Universal maintains that this design is faulty and that Universal should have been warned by Hale of this allegedly latent defect. The configuration of the exhaust pipe in this generator container was said to be quite rare. However, Hale maintains that the configuration of the pipe is not hidden in any way and that Universal had extensive experience with the particular generator unit in question.

Hale's main legal contention as applied to these facts, which was accepted by the magistrate judge, is that any error on Hale's part did not "prevent or seriously handicap" Universal, the stevedore, from performing its functions in a "workmanlike" manner. Hale emphasizes that the ensuing fire was far from inevitable and the fault for not avoiding the loss lies with Universal. First, it is undisputed that Universal was still responsible for reviewing the Hale prestow plan and preparing the final, more detailed, stowage plan. Hale emphasizes that it (Hale) had been responsible for both the prestow and final plan up until 1992. In late 1992, Universal insisted that it prepare the final prestow plan and it charged premium overtime rates for the service. In this case, Mr. Bolton, the Universal "shiprunner" who reviewed Kellenberger's prestow and prepared the final stowage plan, did not catch Kellenberger's error and it was duplicated in the final stowage plan.

It is also undisputed that Universal employees did the actual loading of containers onto the barge. Hale maintains that the Universal employees who physically loaded the barge could have easily detected and corrected the "obvious" problem. Hale emphasizes that Universal loaded the 40 foot generator container and then "loaded the 45 foot container over the generator exhaust." (Br. in Supp. of S.J. at 10). Universal employees then secured the 45 foot container in place, installing twist locks less than three feet away from the "over-stowed exhaust." *Id.* A Universal subcontractor, Multimarine Refrigeration, then hooked up the generator container to the refrigerated units, started the generator, tested its output, and checked the refrigerator temperatures.

Hale also emphasizes that Mr. Cavanaugh, Universal's Marine Superintendent at the site, was inexperienced and does not know if he even performed an inspection on the barge as allegedly required during the loading operation. However, Universal points out that it is undisputed that Kellenberger, Hale's employee, made a final inspection of the barge before the voyage. Hale contends that it was dark when Kellenberger and the tug captain performed their inspection, and Kellenberger's deposition asserts that inadequate lighting was provided, which federal law requires Universal to provide. Cavanaugh testified that he does not know if there was any portable lighting available.

On April 15, 1994, while being towed from Baltimore to Norfolk, the barge caught fire, damaging the barge and its cargo. The undisputed cause of the fire was the stow of the 45 foot container atop the 40 foot generator container, blocking its exhaust.

### III. Summary Judgment Standard

To sustain a motion for summary judgment, the Court must find that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

■ The party seeking summary judgment is initially responsible for identifying the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). When this burden is met, the non-moving party must show, through affidavits or other proof, that a genuine issue of material fact does exist. *Catawba Indian Tribe v. South Carolina,* 978 F.2d 1334, 1339 (4th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). "The mere existence of a scintilla of evidence" will not support this finding. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

■ Summary judgment must be entered against a non-moving party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact....'" *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. In deciding the motion, the Court must view all inferences drawn from the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Either party may submit as evidence "pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits" to support or rebut a summary judgment motion. Fed. R.Civ.P. 56(c).

### IV. Legal Analysis

#### A. Scope of the Ryan duty

■ Universal contends that the magistrate judge erred in recommending that Hale be granted summary judgment on its claim for indemnity from Universal. Universal claims that the implied warranty of workmanlike service in performing stevedoring operations does not apply in this case. The Supreme Court in *Ryan Stevedoring Co. v. Pan–Atlantic Steamship Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), first enunciated this duty. The 1972 Amendments to the Longshore and Harbor Worker's Compensation Act (LHWCA) lessened the need for the indemnity in cases involving injured seamen by limiting the liability of vessels to negligence that proximately caused injuries. As noted in the magistrate judge's report, however, in *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), a case in which an injured longshoreman brought suit against the shipowner under the LHWCA, the Supreme Court described the Amendments and their effect on *Ryan:*

> Prior to 1972, a longshoreman injured ... could receive compensation payments [under the LHWCA] and also have judgment against the shipowner if the injury was caused by the ship's unseaworthiness or negligence. Proof of unseaworthiness required no proof of fault on the part of the shipowner other than an unsafe, injury-causing condition on the vessel. This was true even though the condition was caused, created, or brought into play by the steve-

dore or its employees. In the latter event, the shipowner could recover against a stevedore for breach of express or implied warranty to handle the cargo in a reasonably safe manner. *Ryan* [, 350 U.S 124].·... [A]lthough the 1972 Amendments relieved the stevedore of his duty to indemnify the shipowner for damages paid *to longshoremen* for injuries caused by the stevedore's breach of warranty, *they did not otherwise disturb the contractual undertaking of the stevedore nor the rightful expectation of the vessel that the stevedore would perform his task properly without supervision by the ship.*

*Scindia,* 451 U.S. at 164–65, 170, 101 S.Ct. at 1620–21, 1623 (citations omitted, emphasis added). Moreover, since 1972, the Fourth Circuit has continued to recognize the contractual duty of stevedores to provide workmanlike service in property damage cases. *See Little Beaver Enters. v. Humphreys Rys., Inc.,* 719 F.2d 75, 78 n. 5 (4th Cir.1983) ("While its applicability to shipboard personal injury cases has been statutorily changed by the [amendments], the warranty of workmanlike service has continued vitality in other areas of admiralty."); *see also Salter Marine, Inc. v. Conti Carriers & Terms.,* 677 F.2d 388, 389–90 (4th Cir.1982) (stevedore has duty of workmanlike service to foreseeable third parties). Thus, under the binding precedent in this circuit, Universal is not correct that the *Ryan* duty of workmanlike service has no applicability to this case.

■ Assuming then that Universal had a duty to perform its task with "reasonable care, skill, and diligence," Schoenbaum, *Admiralty & Maritime Law* § 5–8 (2d ed. 1994) (defining "workmanlike service"), the issue becomes, and another Universal objection involves, whether Hale "prevent[ed] or seriously handicap[ed] the stevedore in his ability to do a workmanlike job." *See e.g., Tebbs v. Baker–Whiteley Towing Co.,* 407 F.2d 1055, 1059 (4th Cir.1969). If so, the stevedore is relieved of its duty under the warranty. *Id.* Universal maintains that at the least this issue is a disputed issue of fact. This concept is phrased in *Salter Marine, supra,* and as a separate issue of disputed fact by Uni-

versal, as whether the faults of Hale are "sufficient to preclude recovery." However, it should be reemphasized at this juncture that the warranty traditionally is considered to be contractual in nature, not tort-based. *See, e.g., Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 321, 84 S.Ct. 748, 752, 11 L.Ed.2d 732 (1964). "[I]n the area of contractual indemnity an application of the theories of ... negligence is inappropriate." *Weyerhaeuser S.S. Co. v. Nacirema Operating Co.,* 355 U.S. 563, 569, 78 S.Ct. 438, 442, 2 L.Ed.2d 491 (1958).[1]

One alleged fault of Hale is, of course, the defective prestow plan, showing the 45 foot cargo container placed atop the 40 foot generator container. Universal also objects that Hale was at fault for manufacturing a defective and unreasonably dangerous generator because of the nature of the exhaust pipe and that Hale failed to warn of the danger.

■ This court agrees with Universal that the undisputed evidence shows that Hale shares fault for the accident because of its "stupid mistake" in showing the 45 foot cargo container placed upon the 40 foot generator container in the prestow plan, which mistake was duplicated and implemented by Universal. However, and as the magistrate judge noted, generally "[n]egligence of the shipowner ... will not justify a breach of warranty of workmanlike service on the part of the stevedore." *Villain & Fassio E. Compagnia v. Atlantic & Gulf Stevedores,* 283 F.Supp. 725, 727 (E.D.Va.1968). "Mere concurrent fault" of the shipowner and the stevedore is not enough to supplant indemnity by the stevedore. *Id.; see also Tebbs, supra.* If the stevedore has "brought the unseaworthiness of the vessel into play," the stevedore has breached his warranty and the shipowner is entitled to indemnification regardless of the shipowner's negligence. *Crumady v. The Joachim Hendrik Fisser,* 358 U.S. 423, 428, 79 S.Ct. 445, 448, 3 L.Ed.2d 413 (1959).

The Supreme Court noted in the recent decision of *Howlett v. Birkdale Shipping Co.,* —— U.S. ——, ——, 114 S.Ct. 2057, 2066, 129 L.Ed.2d 78 (1994), that although most vessel

---

1. The court considers the issue of apportioning fault in a tort-like manner *infra.*

owners prepare a stowage plan governing the placement of cargo, "it is the stevedore, an independent contractor hired for its expertise in the stowage of cargo, that is charged with actual implementation of the plan." The Court goes on to note with respect to uncovering defects in the stow that "shipowners engage a stevedore for its expertise in cargo operations and are entitled to assume that a competent stevedore will be able to identify and cope with defects in the stow." *Id.*

▪ The magistrate judge correctly found that there was no evidence to suggest that Hale either prevented or seriously handicapped Universal from performing its duty by supplying Hale with the defective prestow plan. The existence of the defective prestow plan did not relieve Universal of its duty to act competently. Universal contends that there is a question of material fact as to whether it could have deviated from the prestow plan. (Obj. to R & R at 3). Universal states that "Universal was required to follow the Hale plan and could deviate from it only on the authority of Kellenberger." *Id.* Accepting this version of the facts as completely true,[2] however, the undisputed fact remains that no request to deviate from the Hale plan was ever sought by Universal as it prepared its own final stowage plan, physically placed the dry 45 foot container over the protruding exhaust pipe of the 40 foot generator container, tied down the upper cargo container within three feet of the exhaust pipe, and tested the generator container (through its subcontractor). Thus, no alleged factual dispute as to who had ultimate authority over the stowage of the cargo can eliminate the fact that Universal's actions in defectively planning and loading the cargo were a breach of its duty as a stevedore to provide workmanlike service. Had Universal noticed or pointed out at any time the problems with the initial placement of the cargo in the prestow plan[3] and been rebuffed by Hale, the case would clearly be different. There is simply no evidence to suggest Hale

prevented or seriously handicapped Universal from performing its stevedoring function properly. Nor does the evidence suggest that Hale's fault in preparing the defective prestow plan is sufficient to preclude recovery for indemnity when the undisputed evidence shows that Universal had multiple subsequent opportunities to avoid the accident if it had performed its stevedoring function in a workmanlike manner.

▪ The other duty of the shipowner is to warn the stevedore of hazards that are known or should be known to the shipowner and that are not obvious to a reasonably competent stevedore. *Howlett,* 114 S.Ct. at 2063. As to the latent hazard point, the magistrate judge found that the undisputed evidence shows that the hazard was obvious; "the exhaust pipe was not hidden in any way." (R & R at 8). This court agrees with the magistrate judge. There is no evidence to suggest that the hazard in this case was not obvious to a reasonably competent stevedore. Clearly, a question is presented whether Hale in essence manufactured a defective generator container. It is immaterial whether the container is defective or not since the condition was open and obvious. Thus, although Hale is not without fault, the magistrate judge correctly determined Universal breached as a matter of law its duty of providing workmanlike service by loading the 45 foot container in such a way as to physically block the plainly visible exhaust pipe which exited the generator in the 40 foot container.

### B. Comparative Fault

▪ The issue pressed by Universal that most gives pause to this court is primarily a legal one—that is, should a party such as Hale, who appears to this court to be substantially at fault, be indemnified in full by a party such as Universal, who is also at fault? This court concludes that it would be for the Fourth Circuit to announce a new rule of

---

2. Hale maintains that the evidence shows that Hale and Universal engaged in an "ongoing conversation" regarding proper stowage and the operations of the barge. (Reply Mem in Supp. of Mo. for S.J. at 6) (quoting Kellenberger Dep. at 58).

3. As previously noted, the barge was ultimately loaded according to Universal's own final stowage plan, for the preparation of which Universal was paid premium rates.

comparative apportionment in such concurrent fault situations and that this court must apply the existing precedents, which provide for all-or-nothing indemnity.

Some circuits have retreated from all-or-nothing indemnity to apportion fault between a stevedore and a shipowner in similar cases. *See Gator Marine Serv. Towing v. J. Ray McDermott & Co.,* 651 F.2d 1096 (5th Cir. 1981) (apportioning fault for sinking of tug 40% to the vessel and 60% to the stevedore); *Smith & Kelly Co. v. S/S Concordia Tadj,* 718 F.2d 1022 (11th Cir.1983) (comparative fault principles best advance goals *Ryan* attempted to achieve). However, the Fourth Circuit has never embraced a comparative fault approach. In *Farrell Lines Inc. v. Carolina Shipping Co.,* 509 F.2d 53 (4th Cir. 1975) (*per curiam*) the Fourth Circuit rejected an apportionment approach where the vessel owner was 25% at fault. The Fourth Circuit, much like this court's position here, stated that while there is equitable appeal to apportionment, such a change to *Ryan* indemnity doctrine must come from the Supreme Court in light of *Ryan* and *Weyerhaeuser. Id.* at 54. Although about the time of *Farrell Lines* the Supreme Court decided in a different admiralty context—divided damages in ship collision cases—that proportional fault should be the rule, *see United States v. Reliable Transfer,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), the Fourth Circuit's language in *Salter Marine* (which was after *Reliable Transfer*) and *Farrell Lines* to the effect that shipowner fault must be sufficient to *preclude* recovery indicates to this court an ongoing all-or-nothing standard in the *Ryan* context. Similarly, the language of the cases that talks about "preventing or seriously handicapping" the ability of the stevedore to provide workmanlike service provides that in those cases the stevedore is "*relieved*" of its duties. *See, e.g., Tebbs,* 407 F.2d at 1059 (quoting *Albanese v. N.V. Nederi. Amerik Stoomv Maats,* 346 F.2d 481, 484 (2d Cir.1965)).

Finally, the Fourth Circuit in 1982 in *Salter Marine* noted, in a case involving a misloaded barge which capsized, that:

> Even if the tugmaster's actions were negligent, that would not necessarily relieve [the stevedore] of liability, since recovery "for breach of the stevedore's warranty is based upon an agreement between the shipowner and stevedore and is not necessarily affected or defeated by the shipowner's negligence, whether active or passive, primary or secondary."

*Salter Marine,* 677 F.2d at 390 n. 2 (quoting *Italia Societa v. Oregon Stevedoring Co.,* 376 U.S. 315, 321, 84 S.Ct. 748, 752, 11 L.Ed.2d 732 (1964)). This court would certainly more seriously consider the policy arguments that seem to favor comparative fault if such were this court's function. However, the court must apply the precedents as they exist in this circuit. Therefore, because the undisputed fault of Hale in initially indicating that the larger cargo container be placed on the generator container is not sufficient to completely preclude recovery of indemnity, and because the clear fault of Universal in preparing a defective final stowage plan, so loading and tying down the cargo, and finally testing the generator breached its duty of workmanlike service as a matter of law, Hale is entitled to indemnity under existing precedent.

## CONCLUSION

The court AFFIRMS the recommendation of the magistrate judge and GRANTS the summary judgment motion of Hale against Universal for indemnity for breach of Universal's duty to Hale to provide workmanlike stevedoring service. Universal's cross-motion for summary judgment is accordingly DENIED.

The Clerk is DIRECTED to send copies of this order to counsel for the parties.

It is so ORDERED.